IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Ron Tearia Nicholas, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Jon E. Ozmint, S.C.D.C. Director; and )<br>NFN Houser, Chaplain at Kirkland C.I.; )<br>Bernard McKie; Vaughn Jackson; )<br>Gary Boyd; Betsy Lybrand; and Doris )<br>Cureton, )<br>)<br>Defendants. )<br>) | Civil Action No. 8:04-22471-RBH-BHH<br><br>**REPORT OF MAGISTRATE JUDGE** |

The plaintiff, a state prisoner proceeding *pro se*, seeks relief pursuant to Title 42, United States Code, Section 1983.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code Section 1983, and submit findings and recommendations to the District Court.

The plaintiff brought this action on October 7, 2004, against the defendants, the Director and other employees of the South Carolina Department of Corrections ("SCDC"), seeking damages and injunctive relief for alleged civil rights violations. On December 28, 2004, the plaintiff moved to amend his complaint. On January 25, 2005, the motion to amend was granted by the undersigned magistrate judge.[1] On March 14, 2005,

---

[1] Pursuant to this motion, the amended complaint filed on December 30, 2004 is the complaint under which the plaintiff is presently proceeding. (*See* Doc. 12). There is another amended complaint in the record, filed on December 2, 2004, but the plaintiff's motion to amend was filed after this date, and the latest amended complaint was filed on December 30, 2004.

the defendants filed a motion for summary judgment. By order filed March 15, 2005, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. On April 19, 2005, the plaintiff filed a response in opposition to the motion.

On February 16, 2005, the plaintiff filed a motion for a temporary restraining order and preliminary injunction. On April 14, 2005, the undersigned filed a report and recommendation recommending that the motion be denied. By order dated April 14, 2005, the Honorable Bryan Harwell adopted the report and recommendation and denied the plaintiff's motion for a temporary restraining order. The plaintiff filed an interlocutory appeal to the Fourth Circuit Court of Appeals, which, on June 9, 2005, affirmed the decision of the district court.

## APPLICABLE LAW

Rule 56(c) of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" id the evidence offered is such that a reasonable jury

2

might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

### **FACTS PRESENTED**

The plaintiff is currently housed in the Maximum Security Unit ("MSU") at Kirkland Correctional Institution ("KCI").  In his amended complaint, the plaintiff "asserts a violation of his 1st Amend. rights under the free exercise clause."  He alleges that the defendants "created a blanket-ban on all prisoners correspondence containing any religious

books and/or literature" and that the "blanket-ban substantially burdens his religious faith as he has no other feasible means of obtaining the religious material that comports with his religious faith." (am.comp. 3).

In his "declaration" filed on April 18, 2005, the plaintiff asserts that he is a practicing Muslim under the Nation of Islam [NOI] and that "one of the central tenets of [his] faith as an NOI Muslim is to study the works of NOI leader Elijah Muhammed." (pl. decl. ¶ 4). He further states that he is "not allowed to receive any type of Islamic texts in [his] mail," and that the defendants will not allow him to obtain Nation of Islam texts, nor will they furnish such texts to him. (pl.decl.¶ 10).

The defendants submitted the affidavit of Bernard McKie, the Warden of KCI. In his affidavit, Mr. McKie explained the purpose of the MSU at Kirkland:

> The MSU is a specialized housing unit for inmates who have demonstrated an unwillingness to conform to the rules and regulations of a Special Management Unit, who have been charged with violent criminal behavior committed while in the general population, and/or for whom emergency placement has been ordered by the Agency Director or the Deputy Director for Operations.

(McKie aff. ¶ 3). Under SCDC Policy No. OP-22.11, the most common reasons for placement in the MSU are:

- violent escapes or escape attempts with force;

- violent resistance to apprehension;

- aggravated assault on staff or inmates;

- murder and/or attempt to commit murder while incarcerated;

- violent participation in a riot or other institutional disorder;

- seizing and holding a hostage or in any manner unlawfully detaining a person against his/her will;

- circumstances that pose an extraordinary threat to the security and/or orderly operation of an institution; and/or

4

• history of violent and assaultive behavior.

In his affidavit, Mr. McKie states that the plaintiff was placed in the MSU in January 2004 as a result of his participation in a hostage taking and riot at the Broad River Correctional Institution on January 15, 2004 (McKie. aff. ¶ 7).

According to the documents submitted with Mr. McKie's affidavit, the operation of the MSU is governed by SCDC policies. The plaintiff specifically is challenging Paragraphs 13.1 and 13.2 of SCDC Policy OP-22.11, which provide as follows:

> **13.1** MSU inmates may continue to receive periodical subscriptions that were purchased and paid for prior to their admission to MSU until the subscription expires, but only will be allowed to have in their possession the number of paperback books or periodicals authorized in paragraph 14, below. No subscriptions may be renewed.
>
> **13.2** No new periodical subscriptions or purchases of books, publications, or magazines will be approved after the inmate's admission to MSU. MSU inmates will not be allowed to receive any free books, periodicals, publications, or magazines in their correspondence.[2]

Paragraph 14 of OP-22.11 sets forth the limitations on reading material for MSU inmates, who are classified in three different levels. Under this policy, all inmates may possess a copy of "the primary source book for their religion," regardless of their level in the MSU. The three levels in MSU, representing an inmate's behavior and progress through the unit, allow varying degrees of privileges. At Level 1, an inmate may possess one paperback book or periodical; at Level III he may possess three paperback books or periodicals. The plaintiff is currently a Level II inmate; therefore, according to Mr. McKie's affidavit and the internal prison policy, he is permitted to possess up to two books or periodicals from the KCI library (McKie aff. ¶¶ 12-13).

---

[2]The plaintiff also contends that he is asserting a constitutional claim as to Paragraph 13.3 of the regulations, which also prohibits the possession of photographs by MSU inmates. However, this claim was not included in the amended complaint filed December 30, 2004 and so was abandoned by the plaintiff.

## ANALYSIS

The plaintiff argues that he asserting a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA)[3] rather than the First Amendment. However, other than briefly citing the RLUIPA in his preliminary statement and in the prayer for damages in the amended complaint, the plaintiff does not mention the statute in his complaint. In the factual section of the amended complaint, the plaintiff clearly states that he is "assert[ing] a violation of his 1st amend. rights under the free exercise clause." Accordingly, it appears to this court that the plaintiff is claiming a violation of his First Amendment right to the free exercise of his religion. In light of the fact that the plaintiff is proceeding *pro se*, however, the court will address both the alleged constitutional and statutory violations.

### *First Amendment Claim*

The plaintiff alleges that the SCDC policy prohibiting the receipt by mail of subscription magazines, newspapers and books violates the First Amendment. As set forth above, the receipt of such publications by mail by MSU inmates is governed by SCDC Policy No. OP-22.11, specifically paragraphs 13.1 and 13.2. However, the application of these policies must be read in conjunction with paragraph 14, which sets forth the limitations on reading materials for MSU inmates. Under this paragraph, MSU inmates are classified, based upon their behavior and progress towards release from MSU, in one of three categories, Level I, Level II amd Level III. As an MSU inmate progresses, he moves from level to level, with a corresponding increase in privileges. Paragraph 14 provides that an inmate at Level I may possess one paperback book or periodical, progressing up to three paperback books or periodicals in Level III. As a Level II inmate, the plaintiff could

---

[3] 42 U.S.C. § 2000cc-1 (2000).

possess up to two books or periodicals. (McKie aff. ¶¶ 12-13). Moreover, with respect to religious literature, paragraph 14 provides that all inmates, regardless of level, may possess a copy of "the primary source book for their religion." The policy also does not prohibit inmates from possessing other religious materials which were already in their possession prior to admission to the MSU; it does, however, limit the number of such items, based upon the number of items authorized for the inmate's level.

In *Turner v. Safley*, 482 U.S. 78 (1987), the United States Supreme Court stated: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. There are four factors to be considered in making the analysis under *Turner:*

> (1) Whether the regulation is rationally related to a legitimate and neutral governmental objective;
>
> (2) Whether there are alternative avenues that remain open to the inmates to exercise the right;
>
> (3) The impact that accommodating the asserted right will have on other guards and prisoners and on the allocation of prison resources; and
>
> (4) Whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

428 U.S. at 89-90. Moreover, the burden of proof under the *Turner* analysis is on the prisoner to disprove the validity of the prison regulations at issue. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

The regulations in question here are content neutral, *i.e.* limitations are placed on all reading material, not just religious material, though all inmates are allowed to possess the basic "source book" for their religion. Additionally, the defendants assert that the policy is reasonably related to legitimate interests. In his affidavit, Mr. McKie outlined the penological interests served by the limitations on reading materials and publications in the

7

MSU.  These interests include promoting and maintaining discipline, encouraging appropriate behavior by the use of privileges such as obtaining reading materials, reducing fire hazards in the unit, and reducing the opportunity to hide contraband.  The ability to maintain order and provide an important incentive to promote order and discipline within the MSU is particularly compelling.  MSU inmates are considered the most violent and dangerous prisoners, based upon their behavior in prison.  No inmates are placed in the MSU directly from the street.  Thus, the limitations on reading material, which can be lessened to some degree by good behavior, are an important means of maintaining order.  By the time an inmate is placed in MSU, there are very few privileges which can be earned or taken away.  Behavior management is a legitimate penological objective.  Not to be discounted, as well, is the incentive such restrictions have on the general prison population to maintain good behavior so as to avoid being placed in administrative segregation with its attendant loss of privileges (McKie aff. ¶ 16).  Finally, as expressed by Mr. McKie, security reasons also must be taken into consideration.  Mr. McKie states that the limitation on books and publications also limits "opportunity for inmates in MSU to hide weapons and contraband", thus providing "a more secure and safe environment for other inmates and staff."  (McKie aff. ¶ 17).

       In *Overton*, the United States Supreme Court addressed a similar challenge to a policy restricting visitation privileges to encourage good behavior in high security inmates.  539 U.S. 126 (2003).  The court found that "[w]ithdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose."  539 U.S. 126, 134.  Similar considerations in this case convince the court that the restrictions at issue here serve legitimate penological objectives.

Having found that the regulations serve legitimate penological objectives, the court must go on to examine the other *Turner* factors.[4] The second factor to be considered is whether inmates such as the plaintiff have alternative means of exercising the constitutional right they seek to assert. Here, the plaintiff and other MSU inmates are not deprived of all religious books and literature. In fact, under Paragraph 14 of the regulations, the plaintiff is allowed, at all times, to have access to his primary religious book. As a Level II inmate, the plaintiff is also allowed to have two other books or periodicals which he can interchange from the KCI library, and which, obviously, could be religious in nature. The policy only limits the number of materials the plaintiff may possess at any one time, and prevents the plaintiff from receiving new materials by mail. The plaintiff alleges that he is not allowed to receive "any type of Islamic texts" by mail. He does not allege, and has not shown, however, that he may not possess religious texts or materials. His assertion of a "blanket-ban on all religious books" is, quite simply, not supported by the record. The regulations clearly provide that such materials may be possessed by inmates. Thus, the plaintiff has other means by which to exercise his right to practice his religion. Additionally, the plaintiff can always change his behavior, follow prison rules and work his way out of the MSU so that he can return to the general population where religious materials are more readily accessible.

The third *Turner* factor focuses on the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison

---

[4] The defendants note that at least one court has held that the latter three *Turner* factors do not require consideration where the first factor is satisfied. However, the case relied upon by the defendants, *Zimmerman v. Simmons*, 260 F.Supp. 2d 1077 (D.Kan. 2003), was overturned on appeal. *See Jacklovich v. Simmons*, 392 F.3d 420 (10th Cir. 2004). Moreover, in *Overton*, the United States Supreme Court gave conflicted guidance as to whether a court must consider all the *Turner* factors once the court determines that the challenged regulation bears a rational relation to legitimate penological interests. In discussing the challenged restriction on noncontact visits on a right of association ground, the court stated: "We need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests. This suffices to sustain the regulation in question." 539 U.S. at 132. Later, however, the court goes on to specifically discuss the other *Turner* factors. *Id.* at 135-136.

9

resources generally." 482 U.S. at 90.  As noted above, allowing inmates in the MSU the same access to religious publications and other materials as inmates in the general population might have a negative impact on the incentive system of behavioral management.  It is undisputed that the MSU houses inmates who have violated prison rules or pose a threat to prison security.   It is also undisputed that the restrictions on possession of property and publications by inmates in the MSU are used as an incentive to promote good behavior, and, ultimately, release back into the general population. (McKie aff. ¶¶ 8; 14-16).   Thus, providing MSU inmates with materials which are available to all inmates, regardless of their disciplinary status, would undermine the punitive effect of such status and compromise the prison's rehabilitation efforts.  *Ramirez v. McCaughtry*, 2005 WL 2010173 (W.D. Wis. August 22, 2005), *citing Daigre v. Maggio*, 719 F.2d 1310, 1313 (5th Cir. 1983).  The plaintiff has put forward no evidence disputing this adverse impact.

Finally, the fourth *Turner* factor to be considered is whether there are easy alternatives to the restrictions at issue here.   Ready alternatives might suggest an exaggerated response to a problem.  However, "*Turner* does not impose a least restrictive alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."  *Overton*, 539 U.S. at 136.  Here, the plaintiff has offered no reasonable alternative to the restrictions at issue.  Clearly, MSU inmates have more restrictions than inmates in the general prison population, and quite legitimately so. To allow MSU inmates the same access to publications and other materials as all other inmates could, conceivably, serve as a deterrent to such inmates conforming their behavior to the standard required to gain more privileges.

Accordingly, based on the foregoing, the plaintiff has failed to show that the restriction on his ability to receive religious publications in the mail and the limitation on the

amount of religious materials he may possess are unconstitutional.[5]   The court recommends, therefore, that summary judgment be granted to the defendants.

***Statutory Claim***

The plaintiff argues that he is asserting a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), a law passed by Congress in 2000.  This statute provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in Section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §2000cc-1(a).[6]  Thus, under RLUIPA, the restraints on prison administrators exceed the protection afforded inmates by the Free Exercise Clause of the First Amendment, which requires that a restricting practice be "reasonably related to legitimate penological objectives." *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989) (citing *Turner*, 482 U.S. at 89).  However, the RLUIPA requires the plaintiff, as a threshold matter, to show

---

[5] The defendants also correctly note that the same regulations have been examined by several district judges in this district and found to be constitutional.  *See Corey v. Reich*, 2004 WL 3090234 (D.S.C. March 9, 2004); *Strong v. Ozmint*, Civil Action No. 2:03-2256 (D.S.C. March 23, 2004); *Incumaa v. Ozmint*, Civil Action No. 0:03-2776 (D.S.C. September 17, 2004).   However, it must be noted as well that the status of the law on this issue in other districts across the nation is in a state of uncertainty.  *See, e.g. Banks v. Beard*, 399 F.3d 134 (3rd Cir.), *cert. granted*, *Beard v. Banks*, 126 S.Ct. 650 (2005)(upholding constitutional challenge to state corrections department policy restricting access to newspapers, magazines, and photographs by inmates places in prison's long-term segregation unit).

[6] The RLUIPA has been found to be constitutional in the face of an accommodation challenge under the Establishment Clause of the United States Constitution.  *Cutter v. Wilkinson*, 125 S.Ct. 2113 (2005); *see also Madison v. Riter*, 355 F.3d 310 (4th Cir. 2003).

that there is a substantial burden on his ability to exercise his religion. 42 U.S.C. § 2000cc-2(b).

The plaintiff here has not shown that the restrictions in question impose a substantial burden on his religious exercise. He alleges that he has been deprived of access to unspecified religious literature:

> (4)  One of the central tenets of my faith as an NOI Muslim is to study the works of the NOI leader Elijah Muhammed,
>
> (5)  Elijah Muhammed has written several books about the spiritual significance of the Nation of Islam. He has written books about Muslim dietary law, as well as books that give in-depth insight to the Holy Qur'an which is the Holy Book that all Muslims revere as the divine law of God.
>
> (6)  Elijah Muhammed encouraged all Muslims to further their knowledge of Islam, to persevere in understanding all of his spiritual and political concepts.
>
> (7)  I am housed in the Maximum Security Unit.
>
> (8)  Here in this unit, I am not allowed to receive any type of Islamic texts in my mail.
>
> (9)  The defendants designed a policy which creates a blanket ban on all religious books.
>
> (10)  They will not allow me to obtain Nation of Islam texts, nor will they furnish them.

(pl. decl. 1 -2). However, other than his conclusory allegations, there is no indication that the plaintiff has been denied all religious texts or that there is a "blanket- ban on all religious books." In fact, under the policy, MSU inmates are allowed the central book of their faith and may possess other books in numbers appropriate to their classification level. The challenged provisions of the prison regulations are content neutral and only place limitations on the amount of material the inmate may possess at one time and on the receipt of new materials in the mail. Other than his "blanket -ban" claim, the plaintiff does not claim that he has been denied all religious materials nor that he may not possess a copy of the

Qur'an. Accordingly, the plaintiff has not met his burden of showing that the regulations in question impose a substantial burden on the exercise of his religion, as required under the RLUIPA. As such, summary judgment is appropriate.[7]

## *Qualified Immunity*

The defendants further argue that they are entitled to qualified immunity from suit in this case because their conduct did not violate any clearly established constitutional or statutory rights of which a reasonable person should have known. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This qualified immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was clearly established at the time of the alleged violation so that an objectively reasonable official in the defendants' position would have known of it. *Id.* Thus, in ruling on a defense of qualified immunity, a court must (1) identify the specific right allegedly violated; (2) determine whether at the time fo the alleged violation the right was clearly established; and (3) if so, determine whether a reasonable person in the official's position would have known that his action would violate the right. *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir.1992).

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an

---

[7]Having found that the plaintiff has not met his burden under the RLUIPA, it is unnecessary for this court to determine whether the regulations in question serve a compelling governmental interest and are the least restrictive alternative to achieving that interest, as set forth in the Act. However, the court notes that many of the considerations discussed, *supra*, in the First Amendment analysis, also apply to a determination under the RLUIPA. As the defendants argue, the prison policy furthers compelling government interests of maintaining order and discipline and encouraging proper inmate behavior in a high security unit such as the MSU. There are no less restrictive alternatives to achieving these objectives if the limitations were not in place and inmates were allowed unlimited access to books and publications.

actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public. *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

As set forth above, the plaintiff has not alleged the violation of any clearly established constitutional rights. Therefore, the defendants are entitled to qualified immunity.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the defendants' motion for summary judgment be granted. Any pending nondispositive motions are held in abeyance pending the adoption of this report by the district judge.[8]

IT IS SO RECOMMENDED.

s/ Bruce H. Hendricks
United States Magistrate Judge

February 8, 2006

Greenville, South Carolina

---

[8] The plaintiff filed a Motion to Amend/Correct the Complaint on December 2, 2005. By letter dated December 16, 2005, the plaintiff indicated that he was withdrawing the motion "since the defendants are making a big deal out of me amending my complaint" and that he was "just going to file another suit." Additionally, on December 9, 2005, the plaintiff filed a motion to appoint counsel, which this court denies in a separate order filed on this date.

14